1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

ROXANNE HERCULES,                                    No.  C 07-0270 SBA

              Plaintiff,                              **ORDER**

5

6

      v.                                             [Docket No. 20]

7

DEPARTMENT OF HOMELAND
SECURITY, *et. al*,

8

              Defendants.

9

10

**REQUEST BEFORE THE COURT**

11           Before the Court is defendants' Motion for Summary Judgment (the "Motion") [Docket

12   No. 20].  Plaintiff Roxane Hercules, is currently a supervisory employee of Customs and Border

13   Protection ("CBP"), a division of the Department of Homeland Security ("DHS").  Plaintiff who

14   filed unsuccessful Equal Employment Opportunity ("EEO") complaints in 2003 and 2004, later

15   applied for but failed to obtain two promotions.  Plaintiff then sued in 2007, claiming defendants'

16   agents discriminated and retaliated against her, and created a hostile work environment, based on her

17   race, color, age, and protected activities, under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Age

18   Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*

19           The Court finds this matter suitable for disposition without a hearing, under Federal Rule of

20   Civil Procedure 78(b).  As discussed below, the Court finds the undisputed evidence shows no

21   hostile work environment and that defendants' actions were legitimate, non-discriminatory, and non-

22   retaliatory.  Thus, the Court GRANTS the Motion for defendant Michael Chertoff, Secretary, U.S.

23   Department of Homeland Security, in his official capacity, and DISMISSES with prejudice the other

24   defendants Department of Homeland Security and Customs and Border Protection.

25

**BACKGROUND**

26           Hercules is an 45-year old African-American female.  Docket No. 30 ¶ 1 (Decl. of Roxane

27   Hercules ("Hercules Decl.")).  She has been employed with CBP, formerly known as the Customs

28   ///

1  Service,[1] for approximately 16 years.  *Id.*  She was a Seaport Chief from 2000 to 2002, an Airport

2  Chief from 2002 to 2004, and a Seaport Chief (Oakland Seaport) from 2004 to 2005.  *Id.* ¶ 10;

3  Docket No. 29, Ex. "5" at 112-13 (Resume of Roxanne Hercules ("Hercules Resume")).  These are

4  level GS-13 positions.  Hercules Resume at 112-13.

5      In 2003, Hercules filed an EEO complaint, against co-worker Richard Vigna,[2] and others,

6  alleging discrimination based on race, gender, and age, after being suspended for four days on the

7  charge of "failure to comply with policies and procedures on supervisory overtime."  Mot. at 6:6-10;

8  Hercules Decl. ¶ 1; Docket No. 27, Ex. "A" at 131:11-12 (Dep. Tr. of  Roxanne Hercules ("Hercules

9  Tr.")).  Specifically, she believed Vigna reported her to mar her record and make promotion more

10  difficult.  Hercules Tr. at 61:4-10, Hercules Decl. ¶ 6.  The administrative law judge found against

11  her, and she did not appeal.  Mot. at 6:9-10.

12      Then, in 2004, she filed another EEO complaint, again against Vigna and others, alleging

13  race, gender, and age discrimination.[3]  Mot. at 6:11-12.  Specifically, she claimed Vigna, as her

14  supervisor, allegedly delayed her evaluation by two months, to prevent the determination of awards

15  or other matters, costing her an award.[4]  *Id.* at 6:11-14; Hercules Decl. ¶ 1; Hercules Tr. at 60:8-

16  61:10.  The administrative law judge found against her, and she did not appeal.  Mot. at 6:13-14.

17      In November 2004, Hercules applied for the position of Assistant Port Director (Passenger

18  Operations) ("APD Passenger").  Docket No. 26, Exs. "F-6" (Position Description) & "F-11" at 1

19  (Application of Roxanne Hercules and Notification).  She was found one of eight "best qualified"

---

21  [1]      For simplicity, going forward, the Court uses the term "CBP" to mean "CBP and/or the Customs Service."

22  [2]      At the time, Vigna and Hercules were both GS-13, but Vigna later became GS-14 and
23  Hercules' supervisor.  Hercules Decl. ¶ 6; Docket No. 29, Ex. "3," at 17:8-11 (Dep. Tr. of Richard Vigna).

24  [3]      Defendants presented no evidence of this EEO complaint, but Hercules did not dispute these
25  allegations.

26  [4]      Defendants alleged Vigna was not Hercules' supervisor at evaluation time, Mot. at 6 n.4, but
   failed to declare this or provide supporting evidence.  Hercules, however, did cryptically testify,
27  "You're supposed to be under someone 90 days before they can evaluate you.  I wasn't under the
   two 90 days, but I was under him for the majority of that year.  And I did not receive an evaluation
28  from him or any of the other ones ...."  Hercules Tr. at 60:18-22.  Although her statement might
   support the inference defendants assert, the Court will not consider undeclared assertions.

candidates.[5]  Mot. at 3:10.  In December 2004 or January 2005, she applied for the position of Assistant Port Director (Trade Operations) ("APD Trade").  Docket No. 31 at 2:26-3:4 (Mem. in Opp'n to the Mot. ("Opp'n")); Docket No. 26, Ex. "F-12" (Position Description).  She was found one of eight "best qualified" candidates.[6]  Mot. at 3:12.  The APD Passenger position, however, went to Leticia Romero, a 45 year-old Hispanic female, Hercules Tr. at 121:21-122:2; Mot. at 4:17; Docket No. 29, Ex. "7" at 3, while the APD Trade position went to Dora Baldwin, a 31 year-old European-American woman, Hercules Tr. at 126:1-3; Mot. at 4:17-18; Docket No. 29, Ex. "7" at 3.

Nonetheless, In August 2005, Nat Aycox, the San Francisco Director of Field Operations, appointed Hercules to the newly created post of Public Affairs Officer for the San Francisco Field Office.  Hercules Decl. ¶ 13; Hercules Tr. at 119:11-13; Docket No. 26 ¶ 2 (Decl. of Nat. H. Aycox ("Aycox Decl.")).

At some point in 2005, Hercules filed an EEO complaint with CBP.[7]  *See* Docket No. 26 at 1 (Decl. of Lois Hoffman).  Subsequently, on January 16, 2007, she sued defendants alleging their agents discriminated and retaliated against her, and created a hostile work environment, based on her race, color, age, and protected activities, under Title VII, 42 U.S.C. § 2000e *et seq.*, and the ADEA, 29 U.S.C. § 621 *et seq.*[8]  *See* Docket No. 1 (Compl.).  On March 18, 2008, defendants filed their Motion.  *See* Mot. at 1.  This was followed by Hercules' Memorandum in Opposition the Motion (the "Opposition") along with an Affidavit of Roxanne Hercules ("Hercules Decl.") [Docket

---

[5]      Defendants presented no evidence to support this allegation, but Hercules did not dispute it.

[6]      *See* preceding note.  The Court notes Hercules testified in her deposition that she was at the *top* of a "Best Qualified List," created from the applicants' written applications.  Hercules Tr. at 95:3-23.  Defendants alleged, without declaring, this list was not the one which lists the "best qualified" candidates, but was a list which ranks applicants by their own subjective and uncorroborated assessment of their qualifications.  Mot. at 3 n.1.  As the parties did not provide any documentation or further explanation of this issue, the Court is unable to consider it in disposing of the Motion.  Were these allegations true, however, it would not alter the Court's holding.

[7]      The Court has no exact information, as the parties do not discuss Hercules' exhausting her administrative remedies, prior to filing suit.  They do, however, use portions of Exhibit "F" from the investigator's report, as exhibits in this matter.  *See*, *e.g.*, Docket No. 26 and Docket No. 29, Exs. "4" and "7."

[8]      Hercules never mentioned the ADEA in her Complaint, but she claimed age discrimination, *see* Docket No. 1 ¶¶ 6, 16 (Compl.).  Against a federal employer, the ADEA would be her only remedy.  *Chennareddy v. Bowsher*, 935 F.2d 315, 318 (D.C. Cir. 1991).

No. 30], on April 2, 2008, *see* Opp'n at 1, which was followed by defendants' Reply Brief in Support of the Motion (the "Reply") [Docket No. 32], on April 8, 2008.

## LEGAL STANDARD

**A.     Summary Judgment.**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate there are no genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).  An issue is "genuine" if the evidence is such a reasonable jury could return a verdict for the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc*., 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect an action's outcome.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on their pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of material fact exists, the Court views the evidence and draws inferences in the light most favorable to the non-movant.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).  Other legal standards are discussed below as needed.

## ANALYSIS

**I.     Hercules failed to show any discrimination on the basis of race or color under Title VII.**

**A.     Title VII and the *McDonnell Douglas* Analysis**

Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, states in part:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

4

1    conditions, or privileges of employment, because of such individual's race, color,

2    religion, sex, or national origin; or

3              (2) to limit, segregate, or classify his employees or applicants for

4    employment in any way which would deprive or tend to deprive any individual of

5    employment opportunities or otherwise adversely affect his status as an employee,

6    because of such individual's race, color, religion, sex, or national origin.

7    42 U.S.C. § 2000e-2(a).

8    Under 29 U.S.C. § 2000e-16, Title VII covers federal employees.

9        In cases such as this one, where direct evidence of discrimination is lacking, the analysis

10   proceeds under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As such:

11             The complainant in a Title VII trial must carry the initial burden under the

12   statute of establishing a prima facie case of racial discrimination.  This may be done

13   by showing (i) that he belongs to a racial minority; (ii) that he applied and was

14   qualified for a job for which the employer was seeking applicants; (iii) that, despite

15   his qualifications, he was rejected; and (iv) that, after his rejection, the position

16   remained open and the employer continued to seek applicants from persons of

17   complainant's qualifications.

18   *McDonnel Douglas*, 411 U.S. at 802; *see Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062

19   (9th Cir. 2002).

20       "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory

21   reason for the employee's rejection."  *McDonnell Douglas*, 411 U.S. at 802; *see Villiarimo*, 281 F.3d

22   at 1062.  " '[T]he defendant must clearly set forth, through the introduction of admissible evidence,'

23   reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful

24   discrimination was not the cause of the employment action."  *St. Mary's Honor Center v. Hicks*, 509

25   U.S. 502, 507 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 & n.8

26   (1981)).  This is merely a burden of production, not proof, as the ultimate burden of persuasion

27   resides with the employee.  *St. Mary's*, 509 U.S. at 508;  *Villiarimo*, 281 F.3d at 1062.  The burden

28   is also minimal, as the employer need only articulate, not prove, reasons for its actions.  *Bd. of Trs.*

5

*of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 & n.2 (1978).  It need not, however, prove a non-discriminatory intent, *id.* at 25 n.2, and courts "only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo*, 281 F.3d at 1062 (internal quotation marks omitted).

If the employer meets its burden, the burden then shifts to the employee to show the employer's explanation was merely pretext to cover up discriminatory conduct.  *McDonnell Douglas*, 411 U.S. at 804; *Villiarimo*, 281 F.3d at 1062.  The employees' burden of proof for this step is a preponderance.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  The employee may meet this burden by directly showing the employer was more likely motivated by discriminatory intent or indirectly showing the employer's explanation is unworthy of credence.  *Reeves*, 503 U.S. at 143; *Villiarimo*, 281 F.3d at 1062.  "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial." *Villiarimo*, 281 F.3d at 1062.

**B.      Hercules has made a prima facie case of discrimination on the basis of race or color.**

Hercules' initial burden is quite minimal, and she meets it quite easily.  *See St. Mary's*, 509 U.S. at 506; *Villiarimo*, 281 F.3d at 1062.  In this case, the undisputed evidence shows (i) she is African American; (ii) she applied and was qualified for both APD positions; (iii) she was rejected; and (iv) the positions did not go to African Americans.  Hercules has thus made a prima facie case of discrimination on race or color.

**C.      Defendants' reasons for promoting others were legitimate and non-discriminatory and Hercules failed to show they were pretext.**

In her Complaint, Hercules did not identify any specific actors by name.  *See* Compl.  In her October 29, 2007 deposition, however, she testified four individuals were solely responsible for not promoting her:  Assistant Commissioner Jayson P. Ahern, Field Operations Director Nat Aycox, Port Director John Leyden, and Assistant Port Director Richard Vigna.  Hercules Tr. at 43:10-45:15, 134:3-8.  In addition, in her Opposition and declaration she argued her qualifications showed she should have been promoted, and she attempted to present statistical evidence of racial bias in the San

Francisco Field Office.  Examining the actions of these four individuals, and their reasons for not promoting Hercules, as well as her alleged qualification and statistical evidence, the Court finds the material facts are undisputed and no reasonable jury could find defendants' agents discriminated against her based on her race or color.

> **1.      The undisputed evidence shows Assistant Commissioner Jayson P.**
> **Ahern's actions were legitimate and non-discriminatory.**

The person who made the decision not to promote Hercules was Jayson P. Ahern, then Assistant Commissioner of the Office of Field Operations, located in the District of Columbia, who oversaw over 24,000 CBP employees.  Docket No. 26 ¶ 2 (Decl. of Jayson P. Ahern ("Ahern Decl.")).  To make his decisions, Ahern relied on recommendations from Nat Aycox, the San Francisco Director of Field Operations, and nobody else.  *Id.* ¶¶ 4-5, 9-10.  Ahern trusted his local directors to know their area's needs and their organization's dynamics and abilities, better than he. *Id.* ¶¶ 4, 6, 9, 11.  Ahern did not personally know Hercules, her race, color, age, or that she had filed EEO complaints.  *Id.* ¶¶ 3, 15-16.  In her deposition, Hercules testified she had never spoken to Ahern about his decisions.  Hercules Tr. at 45:5-12.  For that matter, in her pleadings, she barely mentioned him, much less accused him of discriminating against her.  Thus, on these undisputed facts, no reasonable jury could find Ahern's actions were illegitimate or discriminatory.

> **2.      The undisputed evidence shows Field Operations Director Nat Aycox's**
> **actions were legitimate and non-discriminatory.**

At the time he made his recommendations to Ahern, Aycox, a 57-year old, European-American man, had been the San Francisco Director of Field Operations since 2003, and with CBP, since 1971.  Docket No. 26 ¶ 1 (Decl. of Nat. H. Aycox ("Aycox Decl.")).  He oversaw CBP activities in Northern California, Guam, and several other western and Pacific states.  *Id.*  He was Hercules' fourth-level supervisor.  *Id.* ¶ 2.  Directly under him were port directors, who managed activities in the ports.  *Id.*  Both APD vacancies were in San Francisco and reported to Port Director John Leyden,[9] who was Hercules' second-line supervisor.  *Id.* ¶¶ 2-3.

---

[9]      Leyden apparently passed away, shortly after retiring.  Hercules Tr. at 43:15-24.

To make his recommendations, Aycox reviewed the materials submitted by the "best qualified" candidates, and considered all of them, including Hercules.  *Id.* ¶¶ 3, 4.  He did not have to conduct interviews because he had personal knowledge of the experience and capabilities of the candidates whom he viewed as most qualified, and whom he was interested in recommending, compared to the other candidates on the list.  *Id.* ¶ 5.  For each position he wanted the candidate with a high level of technical experience, a proven track record in terms of management and direction of others, and the ability to take charge and drive change in the organization.  *Id.*

In regards to the APD Passenger position, when Aycox saw Romero's name on the candidate's list, he knew without a doubt he would select her.  *Id.* ¶ 6.  She had temporarily served in the APD Passenger position and had done an outstanding job.  *Id.*  She had a good reputation, worked well with all levels of management, and was taking the lead in the port's progress.  *Id.*  The position required a person who was proactive, motivated, and with strong leadership skills, to accomplish the ongoing task of merging the three legacy agencies into one.[10]  *Id.*  In addition, Leyden had highly recommended Romero because of her leadership, performance, experience, knowledge, and strong reputation amongst her peers, subordinates, and senior managers.  *Id.* ¶¶ 6-7.

In regards to the APD Trade position, Aycox recommend Baldwin because of her strong technical background, having come up through the ranks in Trade, and her proven capabilities as a supervisor and leader in her field.  *Id.* ¶ 6.  The APD Trade position was a very technical position encompassing many skills that a uniformed officer did not have in approvals, drawbacks, and entry.  *Id.*  A person with this background would be more successful than one with primarily inspection skills, and Aycox believed it would be much easier to train Baldwin on the inspection skills, than vice-versa.  *Id.*  In his mind, the person with a Trade background started with a big "leg up," but Baldwin's resume put her on top.  *Id.*  She had the education and experience, and she was highly sought after by "Headquarters."  *Id.*

///

---

[10]     Aycox was most likely referring to the Customs Service, the Border Patrol, and the Immigration and Naturalization Service, which were merged to form within DHS:  CBP, Immigration and Customs Enforcement (ICE), and Citizenship and Immigration Services (CIS).

In addition, APD (Trade) Francean Rible, who was retiring, recommended Baldwin as her replacement. *Id.* ¶ 3. In contrast, Leyden recommended Fred Gassert, who was then the Acting APD (Trade), as Leyden believed Gassert had more supervisory experience than Baldwin. *Id.* ¶ 7. Aycox went with Baldwin, however, because he saw a more proactive leader in her, with a strong technical background. *Id.* ¶ 8.

With regards to Hercules, in comparing her to Romero and Baldwin, Aycox concluded she was much more detached in her dealings with others and often unavailable and reclusive. *Id.* ¶ 6. When she was in Trade it had been alleged she would come to work, close the door, and stay in her office. *Id.* Further, she had a "checkered reputation,"[11] and was not as technically sound as Romero or Baldwin in their respective positions. *Id.*

At this time, Hercules had been a CBP Supervisor since 2000; had extensive knowledge of seaport and airport operations, as well as trade and enforcement; had been on various airport teams, including those sent to Dallas, Cape Verde, Nairobi, and for a one-year tour of the top ten American airports; had instituted the SEALS program[12] at the Oakland Airport; had worked on trade issues; had a Masters in Science and Information Systems; and, had received many awards and honors. *Id.* ¶ 9. Aycox believed this was all good experience, but in the end it came down to who he believed would make the best APD and would be good for the organization. *Id.* And, he did not believe it was Hercules. *Id.*

When he made his recommendation, he knew by sight that Hercules was African-American, but not her age. *Id.* ¶ 11. He also knew about her EEO complaints, as his position required he be kept advised of all EEO matters. *Id.* ¶ 2. He considered none of this, however, when making his recommendation. *Id.* ¶ 13. Thus, on these undisputed facts, Aycox has articulated legitimate and non-discriminatory reasons for not promoting Hercules, shifting the burden to her to prove they were pretext.

///

---

[11]    Aycox was referring to Hercules' four-day suspension for overtime violations. *See* Mot. at 15:12-15.

[12]    The parties do not identify what this means.

1

**a.      Hercules failed to show Aycox's reasons were pretext.**

2      In her deposition, Hercules testified she never spoke with Aycox about his decision.

3 Hercules Tr. at 44:17-45:4.  She also testified she had no direct dealings with him, *id.* at 84:4-8,

4 110:7-13, and had no problems with him as far as she knew, *id.* at 87:5-10.  In her Opposition and

5 declaration, however, she made three attempts to show Aycox's reasons were without credence.

6      First, she alleged Aycox could not have had personal knowledge of her work product, as he

7 claimed, as he was never her first-line supervisor nor had he interviewed her for the APD positions.

8 Hercules Decl. ¶ 2.  Defendants did not directly address this argument.  The Court notes, however,

9 with regards to Hercules' level-of-supervision argument, it is consistent for Aycox to claim he had

10 personal knowledge of Hercules' experience and capabilities, without being her immediate

11 supervisor.  While her immediate supervisor might have had a more detailed personal knowledge

12 than Aycox did, this would not have deprived Aycox of having some level of personal knowledge.

13 As for Hercules' interview argument, it is not reasonable to infer that had Aycox interviewed all the

14 candidates, he would have gained the level of personal knowledge Hercules seems to believe he

15 should have had before deciding whom to promote.

16      Second, and continuing with Hercules' interview argument, she alleged Aycox's failure to

17 interview all candidates violated chapter 33 of title 5 of the United States Code, 5 C.F.R. § 300 and

18 § 335, and the Tri-Bureau Merit Promotion Plan (the "Plan").  Opp'n at 4 n.4, 10:7-9.  Taking these

19 in order, the Court notes chapter 33 has 33 sections, to which Hercules failed to specifically cite.

20 The Court is thus unable to address her statutory concerns.  Turning to her regulatory concerns, part

21 300 of title 5 of the Code of Federal Regulations contains 35 regulations, while part 335 has 6

22 regulations, to which Hercules failed to specifically cite.  Defendants claim 5 C.F.R. § 335.301

23 provides CBP may establish the Plan if it accords with the provisions of section 335.301.[13]  Reply

24 ///

25

26 [13]      5 C.F.R. § 335.103(a) states:

27            Merit promotion plans.  Except as otherwise specifically authorized by OPM,
an agency may make promotions under § 335.102 of this part only to positions for

28 which the agency has adopted and is administering a program designed to insure a
systematic means of selection for promotion according to merit.

at 8:5-8.  Defendants also correctly noted that section 5.10 of the Plan provides interviews are held at the selecting official's discretion.  Reply at 8:10-20; Docket No. 29, Ex. "8" § 5.10.

Third, Hercules alleged it was inconsistent for Aycox to appoint her as Public Affairs Officer.  As previously noted, in August 2005, Aycox appointed her to the newly created post of Public Affairs Officer ("PAO") for the San Francisco Field Office.  As such, she reports directly to him.  Aycox Decl. ¶ 2.  Hercules claimed the position called for an articulate, professional, and intelligent person.  Hercules Decl. ¶ 13.  Therefore, she argued, if she were as detached or reclusive as Aycox alleged, then it was illogical for him to appoint her to a position dealing with the media.  Opp'n at 9:14-19, 14:16-23.  She also argued it was not a substitute for APD, as she did not advance to GS-14, which would allow advancement to GS-15, and, because even though it was a chief supervisory position, it had no subordinates.[14]  Hercules Decl. ¶ 13; Hercules Tr. at 119:11-120:12.

In his EEO declaration, prepared well before Hercules prepared hers, Aycox testified he had appointed Hercules to this post, to maximize her contribution to the organization, and to maximize her strengths, as she was *articulate* and *presented well,* Aycox Decl. ¶ 18, two skills in which she considers herself strong.  As defendants noted in their Reply, the PAO and APD positions are at different levels with different skill sets.  Reply at 4:1-9.  The Court notes it is not reasonable to infer a person detached from their subordinates, would be detached in their dealings with the media.  Thus, given Aycox's concerns with Hercules' interpersonal supervisory skills, moving her to position less dependent on them, and more dependent on her stronger skills, was consistent with his reasons for not promoting her.  Also, as defendants noted, that Aycox took her under his wing, does not support an inference of discrimination on his part.  *See* Mot. at 18:18-16:3; Reply at 14:10-12.  In conclusion, on these undisputed facts no reasonable jury could find Aycox's reasons for not recommending Hercules for promotion were pretext, rather than legitimate and non-discriminatory.
///

---

[14]      Hercules' implied in her deposition, that after she filed her EEO complaints, she was denied opportunities for advancement. Hercules Tr. at 131:8-21.  Defendants claim Hercules is arguing she was denied "leadership" opportunities, which claim is rebutted by her Public Affairs positions.  Mot. at 14:22-28, 15:18-25.  Hercules argued her current position has no subordinates, and is thus not a "leadership" position.  Opp'n at 15:9-15.  The Court merely notes Hercules has not produced any evidence she was *denied* any opportunities, except for the two promotions at issue in this matter.

1

2

**3.     The undisputed evidence shows Port Director John P. Leyden's**

**actions were legitimate and non-discriminatory.**

3    At the time Leyden made his recommendations to Aycox, he had been the San Francisco Port

4  Director since 2002, and with CBP for 34 years in several management positions.  Decl. of John P.

5  Leyden ¶ 1 ("Leyden Decl.")).  He was also a 57-year old, European-American man.  *Id.*  From 2002

6  through 2005, he was Hercules' second-level supervisor.  *Id.* ¶ 2.  In making his recommendations,

7  he reviewed the materials submitted by all candidates, as he was looking for a high level of

8  leadership skills, work ethic, reliability, initiative, attitude, and performance.  *Id.* ¶¶ 3-5.

9    With regards to the APD Passenger position, he recommended Romero, as she had been by

10  far his best manager, and this was one of the toughest jobs at the port.  *Id.* ¶ 6.  The hours are around

11  the clock.  *Id.*  She was also well respected by her peers, senior management, and most importantly,

12  by her subordinates.  *Id.*  She had worked in and with all areas of the Port, pertaining to passenger

13  operations, enforcement, and trade.  *Id.*  She had a comprehensive background and was a solid

14  manager.  *Id.*  Leyden felt he could put her anywhere and she would be able to lead and get the job

15  done because of her management and leadership skills.  *Id.*

16    For the APD Trade position, he recommended Gassert, while Rible recommended Baldwin.

17  *Id.*  His concern with Baldwin was that she did not have second-level supervisory experience.  *Id.*

18  She did, however, have what they were looking for, the traditional value and classification skills of

19  an Import Specialist.  *Id.*

20    Turning to Hercules, Leyden believed she had comparable knowledge and experience as

21  Romero and Baldwin, but that Hercules did not compare to their leadership skills, management

22  skills, work ethic, attitude, reliability, or actual performance.  *Id.* ¶¶ 6, 9.  Also, Baldwin had come

23  up through the ranks and had a solid background, versus Hercules who had never worked as an

24  Import Specialist.[15]  *Id.* ¶ 6.  And, many of the accomplishments for which Hercules took credit were

25  not directly attributable to her input, but rather while she was on a team or supervised a team that did

26

27  ───────────────

28  [15]    Baldwin's resume shows she came up through the ranks in Trade as an Import Specialist,
Import Specialist Team Leader, and Supervisory Import Specialist.  Docket No. 26, Exs. "F-15" &
"F-16."

the actual work.  *Id.* ¶ 9.  Being on a management inspection team does not necessarily mean someone is the best in a field.  *Id.*  It just means they understand enough of the policies and regulations to go to a port and evaluate if it is following them.  *Id.*

Leyden also knew Romero had as much, if not more international experience, as Hercules, having served as a subject-matter expert for the Container Security Initiative.  *Id.*  During this time she conducted port security assessments in Spain, Argentina, Sweden, and England, and met with high-level members of these governments.  *Id.*  Headquarters continued to request her for TDYs[16] and other special assignments.  *Id.*  She had also received many awards and recognitions, including the Change Agent Award, and was a Bay Area Federal Manager of the Year finalist.  *Id.*  She had also worked and/or supervised the Contraband Enforcement Team (CET), Manifest Review Unit (MRU), Passenger Analysis Unit (PAU), Rover Team, Post Audit, Document Analysis Unit (DAU), Cargo, Outbound, Trade Team, and Passenger Operations.  *Id.*

When he made his recommendations, he knew Hercules was African American, and had been "involved" in her EEO complaint regarding her performance awards.  These issues, however, did not figure at all in his recommendations.  *Id.* ¶¶ 11-13.  Thus, on these undisputed facts, Leyden has articulated legitimate and non-discriminatory reasons for not promoting Hercules, shifting the burden to her to prove they were pretext.

> **a.**     **Hercules failed to show Leyden's reasons were pretext.**

In her deposition, Hercules testified she never spoke with Leyden about his recommendation. Hercules Tr. at 43:15-44:3.  She also testified she saw him in meetings, but did not have a lot of contact with him.  *Id.* at 84:84-9-18.  And, she testified she had no problems with him as far as she knew, *id.* at 87:11-16, nor was she aware of any discriminatory or retaliatory statements by him directed at her, *id.* at 102:22-103:1.  And, she testified that other than Vigna, she knew of nobody else who had made any discriminatory or retaliatory statements.  *Id.* at 103:2-7.  Nonetheless, in her Opposition and declaration, she attempted to provide direct evidence of Leyden's animus, and she attempted to provide indirect evidence by showing his reasons lacked credence.

---

[16]     The parties do not identify what this means.

### i.      Leyden's and Vigna's Alleged Conspiracy

In her declaration, she accused Leyden of conspiring with his allegedly close friend Vigna to retaliate against her by denying her promotion.  Hercules Decl. ¶ 1.  The Court addresses this allegation in part I.C.4 *infra*.

### ii.      Leyden was not hostile to Hercules.

In her declaration, Hercules accused Leyden of harassing her, behaving in a hostile manner, and embarrassing her in front of peers and subordinates.  Hercules Decl. ¶ 1.  Specifically, she alleged he "aggressively and unduly excoriated me and threatened disciplinary action against me.  He did so in front of my peers at a meeting that I attended for managers, offering gratuitously negative comments about me."  Hercules Decl. ¶ 6.  Defendants apparently missed this issue, but the Court observes that "sham" declarations do not create a genuine issue of material fact.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999); *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001).  In her October 29, 2007 deposition, Hercules testified she knew of no racial or retaliatory animus on Leyden's part, towards her, and testified Vigna was the *only* person she knew of who made improper statements.  She cannot then in her April 2, 2008 declaration disagree with herself to create a material factual dispute.[17]  The Court thus disregards these "new" allegations.

### iii.      Leyden had personal knowledge of Hercules' work product.

In her declaration, Hercules also alleged Leyden could not have had personal knowledge of her work product, as he had never been her first-line supervisor, and as he had only been in San Francisco for three years.  Hercules Decl. ¶¶ 2, 7, 23.  With regards to the first argument, as discussed in part I.C.2 *supra*, the Court already held Leyden's superior, Aycox, could use the terms "personal knowledge" to describe his level of knowledge of Hercules' work, without contradicting Hercules' assertion that his knowledge might not be as detailed or in-depth as her first-line supervisor's would be.  This same reasoning applies to Leyden, who is one level closer to Hercules

---

[17]      The Court also notes these allegations of public "excoriation" are surprisingly vague in content and lack details regarding the time, place, or witnesses.

than Aycox.  With regards to the second argument, it is unsupported speculation to allege Leyden could not acquire personal knowledge of Hercules' work product over a three-year period.  Thus, on these undisputed facts regarding Leyden's position and time in it, no reasonable jury could find his reasons for recommending Romero and Gassert were pretext.

### iv.   Leyden properly had Vigna supervise Hercules.

Hercules claimed a jury could infer pretext, because Leyden knew about her EEO complaints involving Vigna, but still made Vigna her supervisor, even though she and Vigna were the same GS grade.  Hercules Decl. ¶ 6.  This allegedly created a "conflict of interest" as she and Vigna were competing for the same positions.  Opp'n at 10:2-3.  Defendants argue Hercules failed to show Leyden did this out of racial animus.  Reply at 2:23-28.  The Court first notes, Hercules did not explain what she meant by a "conflict-of-interest" was created, who it involved, or how, for example, making her a supervisor over Vigna would have somehow avoided it.

Turning to her first argument, Hercules cannot expect this Court to find that an employee who is the target of an *unsuccessful* EEO or EEOC complaint can *never* later supervise the complainant.  That said, however, the Court finds, in a vacuum, Hercules might have raised an issue.  But, without more evidence, she had merely made a prima facie argument, and not provided specific or substantial evidence of pretext.[18]  Thus, on the undisputed fact that Leyden made Vigna a supervisor over Hercules, despite her prior EEO complaints, taken alone or with the other undisputed facts of this matter, no reasonable jury could find Leyden's reasons for recommending Romero and Gassert were pretext.

### v.   Romero was not "pre-selected."

Hercules alleged Leyden illegally pre-selected individuals for promotion, by giving them interim appointments, then promoting them without a competitive process or interviews.  Opp'n at 5:7-10; Hercules Tr. at 127:13-21.  She claimed Romero was thus illegally pre-selected by appointment to the interim APD Passenger position for 120 days, which instead should have been open to all applicants.  Hercules Tr. at 89:1-90:19, 91:3-5.

---

[18]   For example, Hercules does not allege Vigna was unqualified for a supervisory position, or whether anyone else was available with comparable or superior qualifications.

///

Aycox declared, during the EEO investigation in this matter, that they "try to be fair and give people opportunities to further their careers when it is deserved.  [Hercules] can't expect to be given these opportunities at the next level, if she is not performing in an outstanding manner at her current level."  Aycox Decl. ¶ 10.

Leyden testified there had been several Acting APDs besides Romero.  Leyden Decl. ¶ 10. He said he placed persons in this position based on the agency's needs and mission.  *Id.*  For example, Vigna and T. Welte had been Acting APDs and they had entirely different skill sets.  *Id.* He indicated when he assigned them to be an Acting APD, it was to fulfill a purpose based on their ability to perform and their particular skill set.  *Id.*

Nor was being an Acting APD a guarantee of a job.  Romero testified the use of temporary interim appointments was common, with Hercules having been one in Fines and Penalties, Gassert having been one, and Fred Ho having been Acting APD Passenger before Baldwin was, but these three did not keep these positions permanently.  Docket No. 26, Ex. "C," at 35:9-36:1 (Dep. Tr. of Leticia Romero ("Romero Tr.")).  Leyden also pointed out Baldwin was never an Acting APD, yet she was promoted to APD Trade Operations.   Leyden Decl. ¶ 10.  As he testified, "[I]t's all a matter of who's best for the job at the time."  *Id.*

Lastly, defendants noted Appendix 1 of the Tri-Bureau Merit Promotion Plan provides that temporary promotions which last for 120 days or less do not automatically require open competition.[19]  Reply at 8:21-9:2; Docket No. 29, Ex. "8" at 226.  Thus, on these undisputed facts, that Leyden appointed Romero as Acting APD Passenger, no reasonable jury could find Leyden's reasons for recommending Romero and Gassert were pretext.

///

///

---

[19]     As the parties drew the Court's attention to 5 C.F.R. § 335.103, governing merit plans for federal employees, *see* part I.C.2.a *supra*, the Court notes it states in part that agencies may at their discretion except from competitive procedures a "temporary promotion, or detail to a higher grade position or a position with known promotion potential, of 120 days or less[.]"  5 C.F.R. § 335.103(c)(3)(iii).

1   ///

2         **4.**        **The undisputed evidence shows Assistant Port Director Richard Vigna's**

3                **actions were legitimate and non-discriminatory.**

4         Hercules' allegation regarding Vigna is that after she filed her 2003 and 2004 EEO

5   complaints against him, he and Leyden, who were allegedly close friends, retaliated against her  by

6   creating a hostile work environment.  As such, "Vigna tried to withhold me from being elevated to a

7   higher position and he influenced Leyden not to recommend me for any promotion."  Hercules Decl.

8   ¶ 1.  She also claimed he "manipulated" the selection process through his "historic actions,"

9   Hercules Tr. at 63:5-8, 132:1-4, or by "influencing everything all over the place, as an assistant port

10   director," *id.* at 118:25-119:5.  And, she claimed she had a "sterling career," until he decided he did

11   not want an African-American woman as his superior.  *Id.* at 131:17-21.

12         As discussed below, construing all reasonable inferences in Hercules' favor, the evidence

13   shows Vigna's conduct was inappropriate at unspecified times and frequencies.  Nonetheless,

14   Hercules' evidence does not show he discriminated against her based on her race or color, or had

15   anything to do with her not being promoted.  Nor would it not allow a reasonable jury to find that

16   Leyden's or Aycox's reasons for their actions in filling the APD positions were pretext.

17         **a.**        **Vigna made derogatory "inferences" regarding Hercules and**

18                **called her a "bitch."**

19         In her deposition, Hercules testified Vigna called her a "bitch" and said she would "not ever

20   be a port director or anything of that nature."  Hercules Tr. at 56:1-20.  She also said, around his

21   subordinates, he allegedly would "continuously" remark, " 'Look at her.  She's not going nowhere.

22   She's not going to do anything,' blah, blah, blah ...."[20]  *Id.* at 132:14-19.

23         Supervisory CBP Officer Nina Grass, Hercules' *only* witness, testified she had worked in

24   CBP for 20 years, and immediately under Vigna, from around 1993 through around 2003.  Docket

25   No. 26, Ex. "E" at 17:14-18:5 (Dep. Tr. of Nina Grass ("Grass Tr.")); Docket No. 29, Ex. "2" at 6:

26

27 ─────────────────────

28   [20]    Hercules testified Kenny Lakes was standing with her when Vigna used the term "bitch," and made this derogatory inference, and would validate her testimony.  Hercules Tr. at 132:14-19.  No such witness was produced.

9-10, 8:7-10:9 (Dep. Tr. of Nina Grass).  During this time, she could not recall his exact words, but he made comments with a "derogatory inference," directed at Hercules, sometimes during group meetings or to Grass while alone with her.  *Id.* at 10:10-11.  She could not recall how often he made them, though she knew "it was more than twice," but was unsure if it were five or even ten times, as she just did not know for certain how any times he made them.  *Id.* at 11:12-12:7.  She was certain, however, when he made these comments, Ahern, Leyden, and Rible were not present.  Grass Tr. at 17:3-13.  She did recall he "several times" referred to women as "bitches" or something of that nature.  Docket No. 29, Ex. "2" at 13:14-19.

With regards to his language, Vigna testified he might have used the term "bitch" in connection with a work assignment, but not directed at a person.  Docket No. 29, Ex. "3," at 28:19-29:12 (Dep. Tr. of Richard Vigna).  He also said it was a term he used rarely, but he tried very hard to avoid its use at work or in general.  *Id.*  With regards to comments regarding Hercules, Vigna testified it could have been possible he expressed disdain for Hercules in Grass' presence, but he had no specific recollections, and it would not have been his regular practice.  *Id.* at 31:18-32:24.

As for Aycox and Rible, they never heard Vigna say anything discriminatory about anyone's race, color, sex, age, or prior EEO activities, including Hercules.  Docket No. 20, Attach. 2 ¶¶ 5-6 (Aycox); Docket No. 20, Attach. 2d, ¶¶ 5-6 (Decl. of Francean Rible ("Rible Decl.")).  And, neither Romero nor Baldwin ever heard him use the terms "bitch," "nigger," or make any discriminatory statements.  Romero Tr. at 33:11-15; Docket No. 26, Ex. "D"  at 26:11-14 (Dep. Tr. of Dora Baldwin ("Baldwin Tr.")).

The Court first notes for the most part these statements as to what people heard or not, are consistent, as there is no evidence they were all around Vigna or each other 24 hours a day.  Regarding the inconsistencies, Hercules contradicted her own witness and Vigna, on the issue of whether he directed the term "bitch" at her.  Regardless, this is not a genuine dispute, as it is reasonable to infer he could have used the term without intending to direct it at Hercules, even though she reasonably perceived it so directed.  Thus, reasonably construing all the evidence in Hercules' favor, *over a ten-year period*, Vigna called her a bitch *several* times, or *less than once a year*, *some* of those times alone with Grass, and *some* with others present.

18

1    ///

2        The situation is different with regards to Vigna's derogatory inferences.  Grass testified he

3    only made them two to ten times, over a ten-year period, while Vigna said he did not make them

4    regularly, while Hercules' said he made them continuously.  As there is no evidence Grass was

5    around Hercules all the time, to hear what Hercules heard, Grass' testimony is consistent with

6    Hercules'.  Nonetheless, despite the vagueness of the terms "continuously" and "regular," Hercules'

7    and Vigna's testimony could be viewed as inconsistent.  Any genuine dispute, however, would be

8    over immaterial facts.  This is because Hercules' claim is essentially that Vigna continuously

9    impugned her initiative or future prospects, in the presence of others.[21]  Hercules failed to produce,

10   however, any evidence of racial animus in these statements.

11       While the undisputed use of the term "bitch" and the disputed use of the "derogatory

12   inferences" were inappropriate, they were not discriminatory on the basis of race or color, nor do

13   they support such an inference regarding Vigna's behavior.  Further, as the undisputed evidence

14   showed Aycox, Leyden, and Rible were unaware of any of these undisputed or disputed statements,

15   it is unclear how they would have impacted Hercules' application for the APD positions.[22]  Thus, in

16   regards to the undisputed statements, no reasonable jury, based on them, could find Aycox's or

17   Leyden's reasons for their actions in filling the APD positions were pretext.  And, in regards to the

18   disputed statements, they are immaterial regarding discrimination on the basis of race or color, and

19   thus do not defeat summary judgment.

20                    **b.    Vigna uttered one racial slur over ten years.**

21       In her deposition, Grass recalled Vigna once, and she emphasized "once," used the term

22   "nigger."  *Id.* at 12:24-13:6.  In his deposition, Vigna did not recall using the term in the workplace.

23   Docket No. 29, Ex. "3," at 29:24-30:4.  These statements are consistent, in that Vigna did not deny

24   using the term.  The Court notes Grass was very clear about the term and its frequency, but failed to

25   _____

26   [21]    The lack of detail regarding these statements, and absence of other witnesses, tends to suggest Vigna did not often repeat them.

27
28   [22]    There is also no evidence as to when Vigna allegedly made these statements, i.e., in the 1990s, in the early 2000s, evenly over time, *et seq.*  If they were only made in the 1990s, then arguably it is unclear how they would have impacted Hercules' 2005 job application.

note whether it was even directed at anyone in particular.  The Court also notes Hercules failed to mention this incident in her deposition.  Reasonably construing the evidence in her favor, over a ten-year period, Vigna once used this term in the workplace, but not directed at any specific person, and not within hearing range of Hercules, Aycox, or Leyden.  While the use of the term was inappropriate, no reasonable jury could find such behavior racially discriminatory, nor adversely connected to Hercules' application for the APD positions.  Likewise, based on these undisputed facts, no reasonable jury could find Aycox's or Leyden's reasons for their actions in filling the APD positions were pretext.

### c.   Vigna made no informal or formal recommendations regarding the APD positions.

In her deposition, Hercules admitted she knew of no involvement Vigna had, *id.* at 11:25-119:10, or any comments or input he provided to anyone, regarding her application for the APD positions, *id.* at 63:17-23, 134:3-25.  Likewise, in his deposition, Vigna testified he was not involved with, nor made any formal or informal positive or negative recommendations to anyone regarding the APD positions.  Docket No. 26, Ex. "B," at 35:23-36:23 (Dep. Tr. of Richard Vigna); Docket No. 29, Ex. "3," at 19:21-20:23, 25:13-20, 35:23-36:23.  Likewise, Aycox testified he received no input from Vigna regarding filling the APD positions.  Aycox Decl. ¶ 14; Docket No. 20, Attach. 2d ¶¶ 3-4.  And, Rible, Romero, Baldwin, and Grass all testified they knew of no input Vigna had into the selection process.  Rible Decl., ¶¶ 3-4; Romero Tr. at 33:3-10; Baldwin Tr. at 26:3-10; Grass Tr. at 17:14-18:5; Docket No. 29, Ex. "2" at 6:9-10.  On this undisputed evidence, no reasonable jury could find Aycox's or Leyden's reasons for their actions in filling the APD positions were pretext.

### d.   Vigna and Leyden were not close.

In order to establish a connection between Vigna and Leyden, in her declaration, Hercules testified "Leyden and Vigna were close friends who socialized outside of work."  Hercules Decl. ¶ 1. She also declared:

> Both Vigna and Leyden were from the Northeastern part of the U.S. and shared common ground and were socially connected.  Leyden had only been at the

port three (3) years total was not as familiar with everyone as was Vigna and Leyden

relied on him.  It was apparent to the other Chiefs that Vigna had developed a very

close relationship with Leyden.

*Id.* Decl. ¶ 7.

She did not mention this relationship in her deposition, when discussing either of these individuals.

In his deposition, Vigna testified he and Leyden "were not very close."  Docket No. 29,

Ex. "3," at 19:3.  And he testified, he saw Leyden outside of work "not very often," because during

the three years Leyden was Port Director, he and others went out with Leyden as a group only "a

half dozen times."  *Id.* at 18:6-9, 18:16-19:1.  He also recalled when he was promoted, Leyden took

him and one or two others out to dinner, though he could not remember their names.  *Id.* at 19:1-3.

Defendants noted in their Reply that Hercules has presented no evidence to support her

allegations regarding Vigna's and Leyden's allegedly close relationship.  Reply at 2:8-22.  The

Court agrees and notes she never even explained why she believed they were both from the

northeast.  It is also telling that Hercules failed to come forward with any witnesses on this issue, not

even the chiefs who allegedly perceived the close relationship.  On this undisputed evidence, no

reasonable jury could find Vigna and Leyden had a close relationship, nor as a result, that Aycox's

or Leyden's reasons for filling the APD positions were pretext.

        **e.**        **Vigna showed no racial bias in his recommendations.**

In his March 10, 2008 deposition, Hercules' counsel asked Vigna if he had recommended

any African-American women for a GS-14 or -15 position, in the past two years.  Docket No. 29,

Ex. "3," at 1, 30:25-31:2.  In response, he testified he did not believe so as there were none on the

qualified lists for him to recommend.  *Id.* at 31:6-7.  In her Opposition, Hercules claimed this was a

lie as shown by Exhibit "7" to her counsel's declaration.  Opp'n at 11:12-14.  Hercules, however,

failed to explain her conclusion.

The Court notes Exhibit "7" consists of an e-mail and two spreadsheets.  Docket No. 29,

Ex. "7" at 2-6.  Apparently, during Hercules' EEO investigation in this matter, a CBP EEO

Specialist requested a list of all GS-13 employees in the San Francisco Field Office, which included

San Jose and Honolulu, who comprised the applicant pool in November 2004 for the APD positions.

*Id.* at 2.  The second attached spreadsheet appears responsive to this request, showing for November 2004, all San Francisco Field Office employees with the rank of GS-13.  *Id.* at 5-6.  The sheet lists 44 persons, with no names or sexes indicated.  *Id.*  Out of the 44, 32 were in San Francisco.  *Id.*  Of these, only two are indicated as African American.[23]  *Id.*

As for the first spreadsheet, it appears to list persons who were selected by the "DFO," which likely refers to Aycox, as Director of Field Operations, for positions at the GS-11 through GS-14 level, from July 1, 2004 through January 31, 2006.[24]  *Id.* at 3-4.  Of the 81 persons listed, 3 are indicated as African-American women, one GS-12, one GS-13, and one GS-14.  *Id.*  Of the 81 positions filled, only 6 were at GS-14 and only 2 were at GS-15.  *Id.*  The GS-14 positions were filled by one African-American woman,[25] one Hispanic-American woman,[26] one Asian-/Pacific-Islander-American man, one European-American woman, and two European-American men.  *Id.*  The two GS-15 positions were filled by European-American men.  *Id.* at 3.

Defendant does not address this issue, but the Court notes *neither spreadsheet covers the two-year period prior to Vigna's deposition*.  Also, based on the small number of African-Americans, female or otherwise, indicated in these sheets, no reasonable jury could find Vigna lied about being unable to recommend for a GS-14 or GS-15 position, an African-American woman employee, for lack of their appearance on a "qualified" list, in the two years prior to his deposition.[27]

///

---

[23]    The remaining employees comprised one Asian-American in San Jose, with the rest in Honolulu, whose race and ethnicity were coded with letters for which no key was provided.  Docket No. 29, Ex. "7" at 5-6.

[24]    The title indicates the data should only run to July 29, 2005, but the dates indicated run to January 31, 2006.

[25]    Hercules claims, without support, that this person was a lateral transfer, rather than a promotion from within the San Francisco Field Office.  Hercules Decl. ¶ 8.  Whether true or not, this does not alter the low number of African-American women on these spreadsheets.

[26]    This was Romero.

[27]    The Court also notes, if in the two-year period in question, there were only three African-American women at GS-12, -13, and -14 as possible applicants, then it appears only one or two of them would be promotable to GS-14.  And, while the GS-14 employee would be promotable to GS-15, it appears few of these positions exist.  Thus, it appears quite possible Vigna could have gone two years without recommending an African-American woman for a GS-14 or -15 position.

1    ///

2    Thus, his testimony is not evidence that Aycox's or Leyden's reasons for filling the APD positions

3    were pretext.[28]

4              **f.        Vigna properly reported Hercules' overtime violation; There is no**

5                         **evidence of loss due to her delayed review**.

6              In her declaration, Hercules claimed Vigna contacted Internal Affairs in 2003 to report her

7    overtime requests were suspect.  Hercules Decl. ¶ 6.[29]  In her Opposition, she stated, "He well knew

8    by expressing such suspicion that it would taint [my] record, whether true or not, and give him the

9    lead in competing against [me] since [we] were peers and [I] had already filed an EEO complaint

10   against the agency indicating Vigna was the discriminatory official."  Opp'n at 5:17-20, see

11   Hercules Decl. ¶ 6.  She then alleged after she filed her EEO complaint, Vigna failed to give her a

12   timely annual review, so she "missed out on receiving further appropriate awards and monetary

13   payments because of the extended period in which she was not evaluated, in direct violation of

14   agency policy and procedure."  Opp'n at 5:21-6:4.

15             The Court first notes a timing problem with Hercules first allegation regarding her

16   suspension.  Hercules filed her first EEO complaint in 2003, against Vigna, triggered by her four-

17   day suspension, after which he allegedly delayed her annual review by 60 days, triggering a second

18   EEO complaint in 2004.  It is thus unclear how she could declare she had "already filed an EEO

19   complaint against the agency indicating Vigna was the discriminatory official," *before* he reported

20   her overtime violations.  As she testified in her deposition, she started the EEO process *after* she was

21   suspended for four days.  Hercules Tr. at 131:8-12.  On the other hand, in her Opposition, she stated

22   without support, that Vigna was the subject of "several" of her EEO complaints.  Opp'n at 16:5-7.

23   The parties, however, have only mentioned the 2003 and 2004 complaints.

24   _____

25   [28]      In her Opposition, Hercules argued a genuine dispute of material fact existed, where Vigna
          claimed he had no involvement in *her* application process for the APD positions, but where he also
26   claimed he had made recommendations to fill *other* positions.  Opp'n at 16:22-24.  This is not a
          factual dispute.  This is not even close to a factual dispute.  And, it is not even remotely close to
27   supporting a reasonable inference of pretext.

28   [29]      Hercules indicated 2004 in this paragraph, Hercules Decl. ¶ 6, but she most likely meant
          2003, *see id.* ¶ 1; Hercules Tr. at 131:8-12; Opp'n at 16:21-22.

///

With regards to her suspension, the Court notes Hercules did not dispute she was suspended for four days, nor that she violated CBP's overtime policy.  As such, her argument is that Vigna had no right to report her violations, if he did so out of racist animus.  The Court declines to adopt such an argument.  The Court also notes Hercules raised these issues in her EEO complaint, and lost.  As such, on these undisputed facts regarding her suspension, no reasonable jury could find Aycox's or Leyden's reasons for filling the APD positions were pretext.

With regards to her allegedly delayed review, there is no evidence before the Court regarding any of her annual reviews or when they were performed.  Nonetheless, defendants did not dispute the delay allegation, though without support, they tried to argue it was not Vigna's fault.[30] Regardless, even assuming a 60-day delay occurred, Hercules may not rest on the mere allegation she lost awards and monetary payments, in violation of statutes or regulations, but must come forward with specific and substantial evidence, which she has not.  Further, she raised these issues in her second EEO complaint, and lost.  As such, on these undisputed facts regarding her delayed review, no reasonable jury could find Aycox's or Leyden's reasons for filling the APD positions were pretext.[31]

## 5. The undisputed evidence shows Hercules' qualifications were not clearly superior to Romero's or Baldwin's.

"Under this Court's decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  The disparity in qualifications need not be so "apparent as virtually to jump off the page and slap you in the face."

---

[30]     *See supra* note 4.

[31]     Defendants argued Hercules may not relitigate the underlying facts of her EEO complaints, as she did not appeal the findings of the administrative law judges, and thus did not exhaust her administrative remedies.  Mot. at 14:22-17.  The Court simply notes the fact Hercules litigated these EEO complaints, does not prevent her from raising them as the elements of claims, such as retaliation, where the EEO proceedings serve as the triggering element of the claim.  That is, Hercules alleged she was not promoted, in retaliation for filing her EEO complaints.  Thus, up to a certain point, they must be considered as elements of her claim.  The Court addresses them here, in Hercules' discrimination claim, as she argues Vigna's history, during and after the EEO complaints demonstrates pretext.

1   *Id.; Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003).  In the

2   Ninth Circuit, "a finding 'that a Title VII plaintiff's qualifications were clearly superior to the

3   qualifications of the applicant selected is a proper basis for a finding of discrimination.'  *Odima v.*

4   *Westin Tucson Hotel*, 53 F.3d 1484, 1492 (9th Cir.1995)."  *Raad*, 323 F.3d at 1194.

5           Further, as the Supreme Court has held:

6           the employer has discretion to choose among equally qualified candidates, provided

7           the decision is not based upon unlawful criteria.  The fact that a court may think that

8           the employer misjudged the qualifications of the applicants does not in itself expose

9           him to Title VII liability, although this may be probative of whether the employer's

10          reasons are pretexts for discrimination.

11  *Burdine*, 450 U.S. 259.

12          Lastly, as the Ninth Circuit has held, in jobs which "are primarily physical or mechanical, or

13  are tangible or objective in nature, as does the job of furniture delivery truck driver," subjective

14  criteria are more suspect as possible cover for discrimination."  *Nanty v. Barrows Co.*, 660 F.2d

15  1327, 1334 (9th Cir. 1981), *overruled on other grounds by*, *O'Day v. McDonnell Douglas*

16  *Helicopter Co.*, 79 F.3d 756, 760 (9th Cir. 1996).  The suspicion lessens, however, as one moves up

17  into the higher echelons of employment, "the skills for which are necessarily measured in more

18  subjective terms ...."  *Id.*

19          In this case, whether reasonably construing the objective or subjective criteria in Hercules'

20  favor, no reasonable jury could find she was "clearly" more qualified than either Romero or

21  Baldwin.  Looking first at Romero's objective criteria, Hercules testified she had never worked with

22  Romero and knew nothing about her performance or how she related to subordinates, peers, or

23  management.  Hercules Tr. at 89:7-90:2, 91:20-23, 92:1-16, 110:14-111:16, 118:17-19, 122:3-10.

24  The only difference she knew of was she had a masters, while Romero had no post-secondary

25  degree.[32]  *Id.* at 93:12-21.  As Aycox declared, however, he compared Hercules' and Romero's

26  ────────────────────

27  [32]     The undisputed evidence shows Romero earned her Bachelors in Management from
    St. Mary's College of California, in 2005, while working full-time, and raising two children, ages 10
28  and 14.  Romero Tr. at 33:16-34:8.  She graduated with honors, having straight As and one B-plus,
    due to a work-related travel distraction.  *Id.*  Although Hercules referred to St. Mary's as "an ersatz

25

qualifications, and while the former had good experience, Romero did an outstanding job as Acting APD Passenger, worked well with all levels of management, and was taking the lead in the port's progress.

As for Baldwin's objective criteria, Hercules admitted she had no idea what Baldwin's qualifications for the APD Trade position were.  *Id.* at 94:16-95:2, 113:5-12, 118:17-19.  Nonetheless, Hercules felt she was stronger than Baldwin in more areas, such as having more supervisory and customs experience, *id.* at 111:22-112:1, 115:2-4, 118:8-12, but conceded their trade experience was comparable, *id.* at 116:18-20.  In turn, Aycox declared a trade background was superior to an inspections background, and technical ability was critical.  And, as he further declared, Baldwin had come up through the ranks in Trade, and had a strong technical background.  This, as he stated, along with her education, experience, and proven abilities made her the chosen candidate.

In the declaration attached to her Opposition, Hercules identified a number of objective criteria, which allegedly made her the better candidate.  *See* Hercules Decl. ¶¶ 3, 5 9-12, 15, 17-22, 25-27, 29-30.  Although it is too lengthy, and repetitive in parts, to review all her allegations in detail here, she failed to raise a genuine dispute of material fact for the following five reasons.  First, to a large degree, Hercules merely restated part of her resume in her declaration.  *See id.* ¶¶ 3, 6, 9-11, 17-22, 26-27, 29; Hercules Resume.  Aycox reviewed her resume, as did the Court, attached to declarations for both the Motion and the Opposition.  Merely repeating parts of it in a declaration, however, does not explain to the Court how her qualifications were clearly superior.

Second, Hercules sometimes declared her qualifications, without comparing them to Romero or Baldwin.  *See* Hercules Decl. ¶¶ 3, 9-12, 17, 19.  For example, she declared all her evaluations had been "passing."  *Id.* ¶ 9.  Without comparative information, however, the Court cannot tell how this makes Hercules a clearly superior candidate, relative to Romero or Baldwin.

Third, when Hercules did compare her qualifications to Romero or Baldwin, she never

university with online participation and classes held only on Saturday[,]"  Opp'n at 3 n.1, she provided no support for this assertion.  Further, the Court cautions against unsupported argument which tends towards sarcasm.

explained how they related to either APD position.  *See id.* ¶¶ 5, 18, 22, 25-27; Opp'n at 3:22-4:12, 4:16-5:4.  For example, Hercules declared she was a formally trained management/union mediator.

///

///

Hercules Decl. ¶ 27.  She never explained in her Opposition, however, how this was a relevant qualification for the APD Passenger or Trade positions.[33]

Fourth, for certain allegations, such as that her evaluations had all been "passing," her burden of proof is by a preponderance, and her burden of production is "specific and substantial."  She provided no evaluations to the Court, however, and thus failed to meet her burdens for this and similar allegations.

Fifth, a number of allegations were bare summaries, conclusions, or speculations.  *See id.* ¶¶ 9 ("My job performance record is outstanding."); 12 ("I have acquired the technical knowledge, skills, and experience to perform the duties of an" APD.); 14 ("My qualifications far exceed" Romero's or Baldwin's.); 15 ("I have more experience and education than either Romero or Baldwin and am more qualified for both jobs ...."); 16 ("I am known as a very active and involved manager ....");[34] 21 ("Veterans are supposed to be given first priority ....").[35, 36]  Thus, considering all the undisputed evidence regarding Hercules', Romero's, and Baldwin's objective criteria, and construing all reasonable inferences in Hercules' favor, the Court finds no reasonable jury could find Hercules' qualifications were clearly superior to Romero's or Baldwin's.

_____

[33]    Likewise, Hercules made much of having a Masters in Science and Information Systems. Hercules Decl. ¶ 20.  But, she conceded the APD positions did not require a graduate degree, nor had any specific use for one, but merely argued that having more knowledge is just generally better. Opp'n at 14:27-15:1.

[34]    Aside from the hearsay nature of this sworn statement, Hercules failed to meet her specific and substantial burden, such as by providing witness statements.

[35]    If Hercules wished to argue she did not properly receive Veteran's preference, she should have properly litigated the issue.  She may not back-door this issue into this matter, now, via a declaration.

[36]    Some allegations were just confusing, such as that Hercules worked in different positions, including "Customs Inspector, Supervisory Inspector, Fines, Penalty and Forfeitures Office." Hercules Decl. ¶ 9.  Or that she started the SEALS Enforcement Program.  *Id.* ¶ 11.  The Court cannot tell if she held two or five positions, nor does it know what "SEALS" means.

27

1    Turning to subjective criteria, the Court notes the APD positions were at a sufficiently high

2  enough echelon to expect their selection to turn on subjective considerations.  In her deposition,

3  Hercules testified she believed her work ethic, leadership skills, reliability, attitude, and performance

4  were comparable to Romero's, but Hercules felt she was stronger than Romero in her leadership

5  skills and in being proactive and motivated.  *Id.* at *Id.* at 111:22-113:3, 121:4-19.  In turn, the Court

6  notes Aycox did testify that for the APD Passenger position he wanted someone proactive,

7  motivated, and with strong leadership skills.  He also testified Leyden highly recommended Romero

8  because of her leadership, performance, experience, knowledge, and strong reputation amongst her

9  peers, subordinates, and senior managers.[37]  And, in the end, Aycox went with Romero.

10   The Court first notes, an employee's feelings or subjective beliefs do not qualify as specific

11  and substantial evidence of pretext.  *See Schuler v. Chronicle Broad. Co. Inc.*, 793 F.2d 1010, 1011

12  (9th Cir. 1986).  And, even though Hercules might argue an exception should exist where an

13  employee and an employer have differing subjective opinions, *Burdine* and *Nanty* caution otherwise,

14  especially where the disagreement concerns a high-level position such as APD with complex and

15  technical requirements.  The Court is reluctant to even consider substituting its judgment for

16  Aycox's or Ahern's, regarding the candidates' subjective criteria, where it has little or no knowledge

17  of the CBP's or the DHS' practices, operations, or needs, and Hercules has not met her burden to

18  provide the Court with this knowledge.[38]  Thus, considering all the undisputed evidence regarding

19  the candidates' subjective criteria, and construing all reasonable inferences in Hercules' favor, the

20  Court finds no reasonable jury could find Hercules' qualifications were clearly superior to Romero's

21  or Baldwin's.  As such, no reasonable jury could find Aycox's or Leyden's reasons for filling the

22

23

24  [37]   Leyden also testified the position required long hours.  In this regard, the Court notes

25  Romero testified she comes to work every day, puts in her eight hours, and gives "110 percent," to do whatever the agency needs her to do.  Romero Tr. at 48:3-5.  She also does not use her sick leave,

26  but donates it annually.  *Id.* at 48:6-16.

27  [38]   In this regard, the Court notes that Hercules' only witness, Grass, testified she had worked with Hercules, Romero, and Baldwin, and was familiar with all of their backgrounds, and in her

28  opinion, Romero was more qualified than Hercules for the ADP Passenger position, while Baldwin and Hercules were comparably qualified for the ADP Trade position.  *Id.* at 18:6-20:11.

1    APD positions were pretext.[39]

2    ///

3              **6.        Hercules failed to present any statistical evidence.**

4         A discriminatory pattern of hiring or promotion is probative of motive and can therefore

5    create an inference of discriminatory intent with respect to an individual's employment.  *Obrey v.*

6    *Johnson*, 400 F.3d 691, 695 (9th Cir. 2005).  In an apparent attempt to show pretext, Hercules swore

7    in her declaration that the only GS-14 African-American female in the San Francisco Field Office

8    was not promoted from within, but was a lateral transfer.  Hercules Decl. ¶ 8.  She did not, however,

9    provide any evidence to support this allegation.  Thus, the Court is unable to consider this evidence.

10   But, were the Court to consider it, the Court would note it indicates the San Francisco Field Office

11   has an African-American woman, serving at the GS-14 level, which in and of itself, would not

12   suggest racial animus by defendants or their agents.

13        In another attempt to show pretext, Hercules declared:

14             No black officers have been promoted in the Port of San Francisco under CBP

15        or the old U.S. Customs Service to a GS-14 or above position.  There is not one

16        promotion of an African-American woman over forty (or otherwise) at the GS-14 or

17        above level by CBP senior managers within the San Francisco OFO, even though

18        their have been several candidates that were quite experienced and more that capable

19        of filling the position.  In fact, there has not been a Black male or female promoted to

20        a GS-14 position or above even though there are many qualified candidates.

21   Hercules Decl. ¶ 31.

22        First, Hercules does not provide any evidence to support her assertions.  The only data she

23   supplied, as discussed in part I.C.4.e *supra*, only covers November 2004 and the period from July 1,

24   2004 to January 31, 2006.  It thus does not appear to go back far enough to identify what the

25

26   _____
     [39]      Having said this, the Court notes all three women, including Hercules, were found "best"
27   qualified for the APDs for which they applied.  Further, as far as the Court can tell from their resumes
     [Docket No. 26, Exs. "F-11," "F-10" & "F-16"], and the transcripts from Romero's and Baldwin's
28   depositions [Docket No. 27, Exs. "C" & "D"], all the women appear to have relatively impressive
     records, and the CBP is fortunate to have them in its employ.

Customs Service did or did not do, prior to the creation of the DHS, after November 11, 2001. Second, as defendants partially noted, *see* Reply at 10:16-28, Hercules did not identify which promotions had been available, and when, and which candidates were qualified for them, and who got them.  Without this information, the Court cannot verify whether there were "several" or "many" qualified candidates, as she alleges.  In essence, in this case, Hercules provided neither statistics nor ///

evidence on which any reasonable jury could find Aycox's or Leyden's reasons for filling the APD positions were pretext.

### D.      Conclusion

Although Hercules has made a prima facie case of racial discrimination under Title VII, on the undisputed facts of this matter, and construing all reasonable inferences in her favor, no reasonable jury could find defendants' agents discriminated against her on the basis of her race or color, but would find they promoted Romero and Baldwin for legitimate and non-discriminatory reasons.

## II.      Hercules failed to show any retaliation under Title VII.

Section 704 of Title VII, 42 U.S.C. § 2000e-3, states in part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ..., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). In analyzing retaliation claims under Title VII, the Court proceeds under the *McDonnell Douglas* analysis.  *Stegall*, 350 F.3d at 1065.  As such, Hercules must first make out a prima facie case of retaliation, after which the burden of production shifts to defendants to demonstrate their agents acted for legitimate and non-retaliatory reasons, which if they do, shifts the burden back to Hercules to prove their reasons are pretext.  *Id.*

To make out a prima facie case of retaliation, Hercules must demonstrate "(1) she engaged in

1   a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link

2   between her activity and the employment decision."  *Stegall*, 350 F.3d at 1065 (quoting *Raad*, 323

3   F.3d at 1196-97)).  Hercules may establish a causal link by "an inference derived from

4   circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in

5   protected activities and the proximity in time between the protected action and the allegedly

6   retaliatory employment

7   ///

8   decision.' "  *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (quoting *Yartzoff v. Thomas*, 809

9   F.2d 1371, 1376 (9th Cir.1987)).

10          In this case, Hercules may have made a prima facie case of retaliation.  She filed EEO

11  complaints in 2003 and 2004, then was denied a promotion in 2005 by Aycox, who was aware of her

12  EEO complaints, and on whom Ahern based his decision not to promote Hercules.  *See Poland v.*

13  *Chertoff*, 494 F.3d 1174 (9th Cir. 2007) (proper to impute subordinate's alleged bias to superior

14  where former is basis for latter's adverse act).  What is unclear, however, is whether Hercules has

15  shown a sufficiently short temporal proximity to support a causal inference, though on these facts,

16  she probably has.

17         The Court need not resolve this issue, however, because reasonably construing the

18  undisputed facts in Hercules' favor, no reasonable jury could find Ahern, Aycox, Leyden, or Vigna

19  retaliated against her.  First, Hercules' only witness, Grass, established Vigna made derogatory

20  inference towards Hercules and called her a "bitch," from 1993 through 2003, *prior* to her 2003 and

21  2004 EEO complaints against Vigna.  Assuming, for the sake of argument, Vigna continued this

22  behavior into 2005, the fact his conduct remaining consistent, does not suggest his conduct was

23  retaliatory.

24         Second, to the extent Hercules rests her retaliation claim on a conspiratorial social

25  connection between Vigna and Leyden, as discussed in part I.C.4.d. *supra*, it is unsupported by the

26  undisputed evidence.  Third and last, for the same reasons defendants' agents actions were

27  legitimate and non-discriminatory in denying Hercules a promotion, as discussed in part I *supra*,

28  they were legitimate and non-retaliatory.  Thus, reasonably construing the undisputed facts in

1    Hercules' favor, no reasonable jury could find for her on her retaliation claim.

2    **III.      Hercules failed to show a racially hostile work environment under Title VII.**

3          Although not expressly mentioned in Title VII, it is violated "[w]hen the workplace is

4    permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or

5    pervasive to alter the conditions of the victim's employment and create an abusive working

6    environment[.]' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting

7    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *McGinest v. GTE Service Corp.*, 360 F.3d

8    1103, 1112 (9th Cir. 2004).  In order to survive summary judgment, a non-movant must show the

9    existence of a genuine factual dispute regarding whether objectively and subjectively a hostile work

10   environment existed, and whether their employer failed to take adequate remedial and disciplinary

11   action.  *McGinest*, 360 F.3d at 1112.

12         Subjectively, "[i]n determining if an environment is so hostile as to violate Title VII, we

13   consider whether, in light of all the circumstances the harassment is sufficiently severe or pervasive

14   to alter the conditions of the victim's employment and create an abusive working environment."

15   *McGinest*, 360 F.3d at 1112 (internal citations and quotations marks omitted).  An isolated comment

16   will not suffice, but neither is psychological injury required.  *Id.*  "It is enough 'if such hostile

17   conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride

18   in her work, and to desire to stay on in her position.' "  *Id.* (quoting *Steiner v. Showboat Operating

19   *Co.*, 25 F.3d 1459, 1462-63 (9th Cir.1994)).

20         Objectively:

21               In determining whether an actionable hostile work environment claim exists,

22         we look to "all the circumstances," including "the frequency of the discriminatory

23         conduct; its severity; whether it is physically threatening or humiliating, or a mere

24         offensive utterance; and whether it unreasonably interferes with an employee's work

25         performance."

26   *Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 23); *see McGinest*, 360 F.3d at 1113.

27   The analysis is made from the perspective of a reasonable person belonging to the same racial or

28   ethnic group as the plaintiff.  *Morgan*, 536 U.S. at 116 n.10.  "The required level of severity or

1    seriousness varies inversely with the pervasiveness or frequency of the conduct." *McGinest*, 360

2    F.3d at 1113 (quoting *Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir.2001) (quoting

3    *Harris*, 510 U.S. at 23)).

4         In this case, Hercules has not subjectively or objectively shown a racially hostile work

5    environment.  First, she has failed to show any racial animus[40] motivated Ahern, Aycox, Leyden, or

6    Vigna.  Second, she failed to show any continuous, pervasive pattern of racial slurs[41] and/or physical

7    contact, which would make it more difficult for a reasonable African American woman to do her

8    job, take pride in her work, or desire to stay on in her position.  In fact, Hercules seems committed to

9    her work and desires to advance within the CBP.  More importantly, while it may have been

10   inappropriate for Vigna to generically disparage Hercules, or occasionally call her a "bitch," this is

11   not evidence of a hostile work environment, racial or otherwise.  Nor does Hercules fare any better

12   by linking Vigna's comments to the other undisputed evidence, because as just noted, she failed to

13   produce any evidence of racial animus.  Thus, construing the undisputed evidence in Hercules'

14   favor, no reasonable jury could find subjectively or objectively a racially hostile work environment

15   existed.[42]

16   **IV.     Hercules failed to show any age discrimination under the ADEA.**

17        The ADEA, in part, makes it unlawful for an employer "to limit, segregate, or classify his

18   employees in any way which would deprive or tend to deprive any individual of employment

19   opportunities or otherwise adversely affect his status as an employee, because of such individual's

---

20   

21   [40]     Nor may Hercules argue a hostile work environment existed on the basis of age, for the reasons discussed in this part and in part IV *infra*.

22   [41]     Vigna's one racial slur over a ten-year period, certainly does not suffice.

23   [42]     Another hurdle for Hercules in proving a hostile work environment, would be showing

24   defendant was liable for Vigna's actions.  "An employer is vicariously liable for a hostile environment created by a supervisor, although such liability is subject to" two affirmative defenses:

25   "1) it exercised reasonable care to prevent and correct promptly any invidious harassment, and 2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective

26   opportunities provided by the employer or avoid harm otherwise." *McGinest*, 360 F.3d at 1119 & n.12.  While Vigna was Hercules' "supervisor," the alleged harasser must hold a "sufficiently" high

27   position to support imputing liability to their employer.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90 (1998).  The parties did not brief whether Vigna was "sufficiently" high in the CBP

28   hierarchy to support imputation, but the Court need not address this issue, as no hostile work environment existed.

age ....." 29 U.S.C. § 623(a)(2).  The act over covers employees at least 40 years of age.  *Id.* § 631(a).  And, it covers federal employees.  *Id.* § 633a.  Unless a plaintiff has direct evidence of age discrimination, the court analyzes an ADEA claim under the *McDonnell Douglas* analysis.  *Reeves*, 530 U.S. at 142.

In this case, Hercules has made a prima facie case of age discrimination, regarding Baldwin, but not Romero, in that when she was 40 or over, she applied for a position for which she was qualified, but she lost out to a 31-year-old and a 45-year-old, respectively.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (age difference must be "significant").  Nonetheless, construing all the undisputed evidence in Hercules' favor, there is even less evidence to support an inference of age discrimination, than there is to support an inference of racial discrimination, for which there is little to none.  Thus, for the reasons discussed in part I *supra*, there is insufficient evidence for any reasonable jury to find Ahern, Aycox, Leyden, or Vigna discriminated against Hercules on the basis of her age.

## V.   The proper defendants

When a federal employee alleges employment discrimination, the only proper defendant is the head of the agency which employs them.  *Vinieratos v. U.S. Dept. of the Air Force*, 939 F.2d 762, 772 (9th Cir. 1991) (Title VII); *Romain v. Shear*, 799 F.2d 1416, 1418 (9th Cir. 1986) (ADEA), *cert. denied*, 481 U.S. 1050 (1987); *see* 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 633a(c).  As such, the Court dismisses with prejudice DHS and CBP, from Hercules' suit brought under Title VII and the ADEA.[43]

## CONCLUSION

Accordingly, the Court GRANTS the Motion for Summary Judgment (the "Motion") [Docket No. 20] in favor of defendant Michael Chertoff, Secretary, U.S. Department of Homeland Security, in his official capacity.  And, the Court DISMISSES with prejudice defendants Department of Homeland

---

[43]     The only remaining defendant is Michael Chertoff, Secretary, U.S. Department of Homeland Security, in his Official Capacity.  The only actual remaining defendant, however, is the United States of America.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (suit against person in their official capacity is actually suit against entity).

34

1   Security and Customs and Border Protection.

2

3         IT IS SO ORDERED.

4

5         April 28, 2008                              _____
                                                       Saundra Brown Armstrong
6                                                      United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28